## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

            Plaintiff,

Case No. 23-cr-293 (JWB/ECW)

v.

**REPORT AND RECOMMENDATION**

Moeshea Isiah Hart,

            Defendant.

This matter is before the Court on Defendant's Motion to Dismiss Indictment (Dkt. 31) and Motion to Suppress Evidence of an Unlawful Search (Dkt. 30). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

The Court held a hearing on the Motions on December 4, 2023. (Dkt. 35.) Benjamin Bejar, Assistant U.S. Attorney, appeared on behalf of the United States of America ("the Government"). Matthew Deates appeared on behalf of Defendant Moeshea Isiah Hart ("Defendant" or "Hart"), who was present at the hearing. For the reasons stated below, the Court recommends denial of the Motions.

## I.    BACKGROUND

Hart is charged by Indictment with a count of Unlawful Possession of a Machinegun in violation of 18 U.S.C. §§ 922(o)(1) and 924(a)(2). (Dkt. 16.) The Indictment alleges that Hart knowingly possessed a Glock equipped with an attached machinegun conversion device known as a "switch" or "auto sear," enabling it to be fired

as a fully automatic weapon by a single function of the trigger, knowing it had characteristics that made it a machinegun as defined in 26 U.S.C. §5845(b), on or about February 15, 2023.[1]  (Dkt. 16.)

Special Agent Kylie Williamson applied for a federal warrant to search three cell phones found on Hart when he was arrested, and a United States Magistrate Judge signed the warrant on October 5, 2023.[2]  (*See* Gov't Ex. 1; *see also* Dkt. 30-1 (unauthenticated copy of exhibit).)  The supporting affidavit states that in the afternoon of February 15, 2023, Saint Paul Police responded to a 911 caller reporting automatic gunfire shots in a residential neighborhood.  (Gov't Ex. 1 ¶ 7.)  The 911 caller stated that he heard what sounded like automatic gunfire and looked out his window to see "a black Jeep chasing a white Jeep," with the occupants of the black Jeep shooting at the white Jeep.  (*Id*.)  The police did not find either Jeep or discharged cartridge casings at the reported incident location, but did observe a black Jeep (hereinafter, "the Jeep") with no front license plates and a shot-out rear window a few blocks away.  (*Id.* ¶ 8.)  The police made a U-turn to get the Jeep's license plate number and "the Jeep fled at a high rate of speed."  (*Id.*)  The police began a high-speed chase but then ended it for public safety reasons.  (*Id.*)  They continued to follow the Jeep from a distance and observed it run a red light, crash into another motorist, and "careen into and through the corner of a restaurant that was closed

---

[1]     The statute uses the term "machinegun" instead of "machine gun."  18 U.S.C. § 922(o).  The Court does the same.

[2]     At the December 4 hearing, the Court admitted the search warrant and affidavit without objection as Government Exhibit 1.  Page citations to Government Exhibit 1 are to the pdf pagination.

at the time," where it "became stuck" despite the driver's attempts to exit through another side of the restaurant. (*Id*. ¶¶ 8-9.)  The driver's side door was pinned, so the three male occupants got out of the passenger-side door and were immediately arrested. (*Id.* ¶ 10.) Through a "process of elimination" using video evidence of the Jeep occupants' attire, officers determined that Hart had been the driver of the Jeep. (*Id*. ¶ 15.)

Officers found a firearm on the floor of the restaurant near the driver's side door of the Jeep, described as "a Glock model 45, 9mm pistol, bearing serial number BSNC265," which "was loaded with a round in the chamber." (*Id.* ¶ 12.)  A "high-capacity, thirty-one-round magazine, loaded with fourteen (14) live rounds, was inserted in the firearm." (*Id*.)  Additionally, "a machinegun conversion device, commonly known as a 'switch,' was affixed to the rear plate of the pistol." (*Id*.)  The affiant stated in the search warrant application, "I know, based on my training and experience, that a 'switch' is designed to enable a semi-automatic pistol to fire as an automatic machinegun with a single pull of the trigger." (*Id*.)  Finally, officers found "eleven (11) 9mm discharged cartridge casings (DCCs) primarily in and around the driver's area of the Jeep, including one DCC outside of the Jeep on the floor of the restaurant." (*Id*.)

The officers seized, "incident to arrest and from the person" of Hart, three cell phones described as: (1) a blue-colored Apple iPhone in a clear case; (2) a black-colored Android "Blu" brand cell phone; and (3) a cream-colored Apple iPhone with gold trim. (*Id.* ¶ 4; *id* at 18.)[3]

---

[3]    Unless otherwise indicated, page numbers refer to the CM/ECF pagination.

The Minnesota Bureau of Criminal Apprehension ("BCA") Forensic Science Lab conducted DNA analysis on the firearm and magazine and determined that Hart "could not be excluded from having contributed to the DNA profiles found on four areas of the firearm." (*Id*. ¶ 17.) The BCA concluded there was

> "very strong" support that Hart contributed to the DNA profile obtained from the magazine's floor plate, follower, feed lips, etc.; "limited support" that Hart contributed to the DNA profile obtained from the textured grips of the firearm; "very strong" support that Hart contributed to the DNA profile obtained from the firearm's slide serrations, levers, magazine release, etc.; and "strong support" that HART contributed to the DNA profile obtained from the firearm's muzzle area.

(*Id.*)

According to the affidavit, the firearm at issue was lawfully purchased from a Federal Firearms Licensee in Minnesota on March 13, 2021 by "an individual not named in this case." (*Id*. ¶ 21.) About one year after purchase, on February 15, 2022, the firearm was correlated to a "shots-fired incident" in Minneapolis. (*Id.*) No suspects or victims were identified in that incident. (*Id.*)

The affiant then described why she sought the requested cell phone evidence based on her "training and experience":

> 25. Your Affiant knows, based on training and experience, that it is common for individuals who unlawfully possess firearms, ammunition, and/or machinegun conversion devices, to communicate with others about the acquisition, possession, use, and/or sale or trade of those firearms and firearms-related accessories and to maintain evidence of those firearms, firearms-related accessories, and/or firearms-related crimes in their residences, vehicles, and electronic devices, such as the Cell Phones, to include evidence described in Attachment B.

> 26. Social media applications commonly contain such photographs, videos, and messages, shared between users, that are commonly created and posted

4

through the use of cellular telephones. In other investigations, Your Affiant has obtained information from social media platforms, to include Snapchat, Facebook and Instagram, and from cellular telephones, that aided in investigations of the criminal possession and use of firearms and the unlawful possession of machinegun conversion devices.

27. Your Affiant knows that social media applications such as Snapchat, Facebook and Instagram are often downloaded onto a user's physical cell phone, such as the Cell Phones, through which the application is then accessed and used. Based on my training and experience, I know that, in addition to the photographs, videos and messages between users on social media applications, a physical cell phone possessed by an unlawful possessor or user of a firearm often will contain additional photographs, videos, text and SMS messages, and other correspondence that were not posted to social media and that also relate to or evidence criminal possession and use of firearms and/or the unlawful possession of machinegun conversion devices.

28. Based upon my training and experience in firearms-related investigations, I know the following to be true:

> a. Individuals who possess, use, sell, trade, or broker firearms, often keep evidence of their firearms-related crimes on their cellular phones. The evidence can be in the form of photographs, videos, location information, and/or correspondence related to the firearm(s) they possess, obtain, sell, or broker, including the type of firearms, amounts paid or received for the firearms, contact information for potential co-conspirators selling or obtaining the firearms.

> b. Groups of people often use their cell phones to photograph and/or video themselves together during gatherings, to show associations with each other, with their group, and with their "assets." Those assets commonly include firearms, controlled substances, certain clothing, jewelry, tattoos, or hand signs, quantities of cash, and other indicia of group association, to promote their status and to possibly intimidate others.

29. In my experience, I have often found evidence in the form of photos, videos, and/or written correspondence electronically stored on cellular phones of individuals who violate firearms laws. In cases I have investigated for unlawful firearms-and controlled substance-related crimes, after warrant-authorized searches of cell phones, I have often found evidence depicting the violators and/or their associates in possession of firearms, extended magazines, cash and/or controlled substances.

(*Id.* ¶¶ 25-29.)

The warrant authorized agents to search for and seize "[a]ll electronic records" on the three cell phones "that evidence, relate to, or constitute, violations of 18 U.S.C. § 922(o)(l) (knowingly possessing a machinegun)." (Gov't Ex. 1 at 20.) This included:

a. Social media posts evidencing, relating to, or constituting: firearms, ammunition, firearms accessories (such as magazines), machinegun conversion devices or "switches", and/or the possession, use, and/or trafficking of firearms;

b. Photographs, videos, or other electronic depictions of: firearms, ammunition, firearms accessories (such as magazines), machinegun conversion devices or "switches";

c. Texts or other electronic communications relating to: firearms, ammunition, firearms accessories (such as magazines), machinegun conversion devices or "switches"; and/or the possession, use, and/or trafficking of firearms;

d. Any Internet, web-browsing, or search history relating to: firearms, ammunition, firearms accessories (such as magazines), machinegun conversion devices or "switches";

e. Call logs, call records, and call histories evidencing or relating to whom HART was in communication with, from and including March 13, 2021, through and including February 15, 2023.

(*Id.*) It also included: "Evidence of user attribution showing who used, possessed, or owned the Cell Phones during the time the things described in this warrant were created, edited, accessed, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history." (*Id.*)

Hart seeks dismissal of the Indictment on the basis that the charging statute, 18 U.S.C. § 922(o) (unlawful possession of a machinegun), is unconstitutional as applied to

him in violation of the Second Amendment. (Dkt. 31 at 3-11.) Hart also seeks

suppression of all evidence obtained from the search of the three cell phones because the

underlying warrant lacked probable cause. (Dkt. 30.)

## II.    MOTION TO DISMISS

Hart argues that 18 U.S.C. § 922(o) is unconstitutional as applied to him in

violation of the Second Amendment in light of the United States Supreme Court's

decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). (Dkt. 31.)

The Second Amendment provides: "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear arms shall not be

infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court

held that the Second Amendment protects an individual's right to possess a firearm for

traditionally lawful purposes such as self-defense within the home but maintained "the

historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"

554 U.S. 570, 627-29 (2008). Relying on *Heller*, in *United States v. Fincher*, the Eighth

Circuit held that possession of machineguns is not protected by the Second Amendment

because machineguns "are not in common use by law-abiding citizens for lawful

purposes and therefore fall within the category of dangerous and unusual weapons that

the government can prohibit for individual use." 538 F.3d 868, 874 (8th Cir. 2008).

Recently, however, the *Bruen* Court adopted the following test for determining

whether a government regulation of firearms is permissible:

> [W]e hold that when the Second Amendment's plain text covers an
> individual's conduct, the Constitution presumptively protects that conduct.
> To justify its regulation, the government may not simply posit that the

7

regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)) (footnote omitted).

Hart argues: "Section 922(o), which bans machine gun possession, violates the Second Amendment both facially and as applied after *Bruen*, because it criminalizes possession of firearms 'in common use' for the purpose of self-defense, and the statute is inconsistent with the Nation's historical tradition of firearms restrictions." (Dkt. 31 at 3.) He then explains why he believes *Bruen*'s two-part test supports dismissal of the indictment. (*Id.* at 3-11.)

Hart first contends that the Second Amendment's plain text covers § 922(o), because "*all firearms*"—including machineguns—are included among the "arms" protected by the Second Amendment, satisfying the first step of *Bruen*. (*Id.* at 4-5.) In making this argument, Hart relies on *Bruen*'s language when deciding that "the plain text of the Second Amendment protects . . . carrying handguns publicly for self-defense" because "the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" (*Id.* (quoting *Bruen*, 597 U.S. at 32).) According to Hart, "[t]he *Heller* Court's reference to the 'historical tradition' of prohibiting these types of firearms [dangerous and unusual

weapons] indicates that the question of firearm type is more properly addressed in the second step of *Bruen*: the historical-tradition analysis." (*Id.* at 4.)

Hart then argues that even if this Court considers whether machineguns are among the "arms" protected by the Second Amendment at "*Bruen* step one," they do enjoy such protection because "machineguns do not meet the definition of a 'dangerous and unusual' weapon, as the Supreme Court has interpreted that phrase." (*Id.* at 5-6.) However, Hart "acknowledges that this runs counter to existing Eighth Circuit caselaw"—namely, *Fincher*—holding "that machineguns 'fall within the category of dangerous and unusual weapons that the government can prohibit for individual use.'" (*Id.* (quoting *Fincher*, 538 F.3d at 874).) Hart then relies on Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016), when preserving his arguments for further review, including his arguments that machineguns are not "unusual" or "'dangerous' as that term is used in the phrase 'dangerous and unusual.'" (*Id.* at 6-8.) Finally, Hart argues "[e]ven if the Court were to somehow take *Heller* as excluding the carrying of dangerous and unusual weapons from the Second Amendment's plain text, § 922(o) intrudes upon a greater level of liberty by criminalizing the simple *possession* of these firearms," rendering § 922(a) presumptively unconstitutional. (*Id.* at 8.)

Hart then argues that if § 922(o) is analyzed at *Bruen* step two, the Government cannot meet its burden to show that § 922(o)'s restrictions are consistent with the Nation's historical tradition of firearm regulation. (*Id.* at 8-11.) According to Hart, this requires dismissal of the Indictment under the Second Amendment. (*Id.* at 11.)

9

The Government responds that the Motion should be denied because machineguns fall outside of *Bruen*'s reach in view of *Fincher*'s conclusion that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." (Dkt. 33 at 6 (quoting *Fincher*, 538 F.3d at 874).) The Government further notes that the Eighth Circuit, post-*Bruen*, has rejected challenges to § 922(g)(1). (*Id.*) The cases cited by the Government conclude that "[n]othing in the Supreme Court's decision recognizing an individual right to keep and bear arms 'should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons'" and "the felon-in-possession statute is constitutional, and there is 'no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).'" *United States v. Dunn*, 76 F.4th 1062, 1068 (8th Cir. 2023) (quoting *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023), *petition for cert. filed,* 69 F.4th 495 (Dec. 6, 2023)). As to firearm type restrictions, the Government cites a post-*Bruen* decision from the Northern District of Iowa as finding "sections of the National Firearms Act under Title 26, which regulates machineguns, constitutional in a post-*Bruen* decision." (*Id.* at 7 (citing *United States v. Wuchter*, No. 23-CR-2024 (CJW/MAR), 2023 WL 4999862, at *6 (N.D. Iowa Aug. 4, 2023).)[4]

---

[4]    *Wuchter* involved challenges to 26 U.S.C. § 5861(d), which makes it a crime to possess an unregistered sawed-off shotgun, and 18 U.S.C. § 922(g)(3), which imposes firearms and ammunition restrictions on "any person . . . who is an unlawful user of or addicted to any controlled substance." 2023 WL 4999862, at *1. The Government also cites *United States v. Wendt*, 650 F. Supp. 3d 672, 679-80, 684 (S.D. Iowa 2023), as "finding pretrial release condition under § 3142(g), restricting possession of

The Court has carefully considered Hart's *Bruen*-based arguments, including his arguments as to the correct step at which to consider firearm type regulations and whether machineguns are dangerous and unusual. However, *Bruen* cited *Heller* when explaining "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 672). At least one district court has concluded that "[t]he Supreme Court's holding in *Bruen* did not overturn *District of Columbia v. Heller*, in which the Court recognized the importance of the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Wuchter*, 2023 WL 4999862, at *2 (cleaned up). And *Bruen* did not address whether machineguns are "dangerous and unusual weapons" today. Under these circumstances, the Court cannot conclude *Fincher* is no longer good law. *Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) ("The District Court . . . is bound to apply the precedent of this Circuit." (citation omitted)). The Court consequently does not reach Hart's other *Bruen*-based arguments.

***

For these reasons, the Court recommends denial of Hart's Second Amendment-based Motion to Dismiss (Dkt. 31).

---

machineguns, did not facially violate [the] Second Amendment post-*Bruen*." As *Wendt* focuses on pretrial release conditions under the Bail Reform Act, the Court does not find it particularly persuasive here.

### III.   MOTION TO SUPPRESS EVIDENCE

Hart argues that all evidence obtained by law enforcement during a search of three different cell phones must be suppressed because the warrant used to justify the search was not supported by probable cause.  (Dkt. 30 at 1.)  Hart argues that (1) the warrant application lacked any particularized allegations that evidence of the charged offense would be found on the cell phones, and (2) the search warrant authorized a search dating back to March 13, 2021 and was thus constitutionally overbroad in scope and unrelated to the charged offense.  (Dkt. 30 at 3.)  The Court addresses each argument in turn.

### A.   Legal Standard

The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.

The Eighth Circuit has explained that "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause."  *United States v. Parker*, 836 F.2d 1080, 1083 (8th Cir. 1987).  "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).  "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Murphy*, 69 F.3d 237, 240 (8th Cir. 1995)).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007) (citation omitted). "'[W]hen the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Wiley*, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting *Solomon*, 432 F.3d at 827). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)). Nevertheless, "[a] magistrate [judge]'s 'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *abrogated on other grounds*, *Gates*, 462 U.S. 213). The reviewing court's duty is to ensure that the issuing judge "had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39 (cleaned up).

The Fourth Amendment provides that "no Warrants shall issue . . . [unless] **particularly describing** the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). The Fourth Amendment's particularity requirement avoids "a general, exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). This particularity requirement applies to the person suspected

13

of the offense and the persons or things to be seized. *United States v. Grubbs*, 547 U.S. 90, 96 (2006).

Courts judge compliance with the particularity requirement according to "a standard of practical accuracy rather than a hypertechnical one." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (quoting *United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010)). "The [F]ourth [A]mendment requires that a search warrant's description of the evidence to be seized be 'sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized.'" *United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988) (quoting *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir. 1978)). How specific a warrant must be varies "depending on the circumstances and the type of items involved." *Id.* at 519 (quoting *Muckenthaler*, 584 F.2d at 245). As such, courts do not resolve issues concerning particularity "in a vacuum," rather, "[t]he court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Fiorito*, 640 F.3d at 346 (quoting *Milliman v. Minnesota*, 774 F.2d 247, 250 (8th Cir. 1985)).

As explained in *United States v. Jackson*:

Although courts sometimes treat particularity and breadth synonymously, *see, e.g.*, *Kiesling v. Holladay*, 859 F.3d 529, 537 (8th Cir. 2017) ("The Fourth Amendment's particularity requirement commands that an overbroad warrant is not saved if probable cause is lacking for only some, but not all, of the items to be searched."), technically speaking, particularity and breadth of a warrant are separate issues, *see In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856-57 (9th Cir. 1991) ("Particularity is the

14

> requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.") (citation omitted); *United States v. Adams*, No. 17-cr-64 (DWF/KMM), Dkt. No. 221 (D. Minn. Sept. 17, 2018), *R&R adopted*, 2018 WL 6445547 (D. Minn. Dec. 10, 2018).

No. 18-CR-211 (JNE/ECW), 2019 WL 13127190, at *9 (D. Minn. Jan. 4, 2019), *R. & R. adopted*, 2019 WL 13127184 (D. Minn. Feb. 26, 2019).  Neither party asserts that a distinction between particularity and overbreadth matters for the analysis in this case.

**B.    Analysis**

**1.    Particularity**

Hart argues that the search warrant was based on "unparticularized allegations that relevant evidence might be found on the cell phones."  (Dkt. 30 at 6.)  Hart asserts that "[c]ourts are especially attuned to the importance of particularity in the context of digital searches like the one at issue here" and quotes case law for the proposition that a computer hard drive is "akin to a residence in terms of the scope and quantity of private information it may contain" and "[t]he potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous."  (*Id.* at 6-7 (quoting *United States v. Galpin*, 720 F.3d 436, 446-47 (2d Cir. 2013)).)  Hart argues that nothing in the search warrant application sufficiently explains "why law enforcement believed evidence of the charged crime would be found on any of the three cell phones."  (*Id.* at 6.)  Hart further argues that the warrant application relies "almost entirely upon the affiant's 'training and experience' to recount what is 'common for individuals who unlawfully possess firearms, ammunition, and/or machine gun conversion devices' to do with their

cell phones" and "there is nothing in the warrant application that is specific to Mr. Hart or his particular use of the cell phones." (*Id*.)

The Government responds that the information sought was limited to evidence related to Hart's possession of the fully automatic firearm, and provided the issuing judge with a substantial basis to conclude that it would be reasonable to seek the evidence from the cell phones' contents. (Dkt. 33 at 4.) The Government further argued that "the affidavit provided an ample nexus between Hart, the possession of the machinegun, and probable cause to believe that evidence of Hart's possession would be found within the cell phones seized from Hart incident to his arrest." (*Id.*) Finally, the Government cites several cases where courts relied on "training and experience" statements when finding a warrant supported by probable cause. (*Id.* at 4-6.)

The Court understands Hart to be arguing that the affidavit was not particularized as to why there would be probable cause to believe the three phones would contain evidence of possession of a machinegun. In a slightly different context, the Eighth Circuit has held that there is probable cause to believe evidence of drug trafficking can be found at the alleged trafficker's residence where "officers have stated that in their experience such an inference is appropriate and in which a supporting affidavit also described a defendant's continuous course of drug trafficking activity." *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007). Similarly, courts have found "training and experience" statements relating to evidence of firearms-related crimes found on cellular phones along with evidence linking a firearms-related crime to a suspect can establish probable cause to search a cellular phone found on the suspect's person for evidence of

16

the firearms-related crime. *See United States v. Carter*, No. 20-CR-104, 2022 WL 2128509, at *1-2, *4-5 (W.D. Penn. June 14, 2022) (finding "training and experience" statements, knowledge that suspect was a convicted felon prohibited from possessing a firearm, and knowledge that suspect did possess a firearm established probable cause for search of suspect's cell phones "'for evidence, fruits, and instrumentalities' of violations of 18 U.S.C. § 922(g)(1)," including evidence relating to suspect's acquisition of the firearm and other persons involved in the unlawful transfer of firearms); *Jackson*, 2019 WL 13127190, at *9 ("Based on these statements about Jackson's gun possession, Jackson's gang membership, the fact that the cell phone sought to be searched was on Jackson's person when he was arrested with the gun in the vehicle, and Deputy Burtus' experience that gang members and 'prohibited persons' take photos of themselves with their phones and text about possessing guns, the issuing Hennepin County judge had a substantial basis for concluding that there was a fair probability that evidence of Jackson's possession of a firearm could be found on the cell phone and the requisite nexus between that crime and the cell phone.").

Here, the supporting affidavit includes the agent's statements, based on her training and experience, that persons who "possess, use, sell, trade, or broker firearms, often have evidence of their firearms-related crimes on their cellular phones," including communications relating to the acquisition, possession, and use of the firearms and photos and videos showing the possession and use of the firearms. (Gov't Ex. 1 ¶¶ 25-30.) Based on these "training and experience" statements along with the statements linking Hart to a shooting incident involving automatic gunfire, the Glock fitted with an

auto sear recovered at the scene, the DNA analysis linking Hart to four areas of the Glock, and the three cell phones recovered from Hart's person, the Court concludes that there was probable cause to believe that evidence of Hart's acquisition and possession of a machinegun would be found on the three cell phones at issue and that the affidavit and warrant were sufficiently particularized in this regard.

### 2. Overbreadth

Hart argues that the "scope of the timeframe (or look-back period) of the search is also overbroad." (Dkt. 30 at 7-8.) Hart argues that although the date of the alleged offense is February 15, 2023, the search warrant authorizes law enforcement to search the cell phones and seize "call logs, call records, and call histories" showing with whom Hart communicated from approximately two years prior on March 13, 2021 until the date of the alleged offense. (Gov.'t Ex. 1 at 19.) Hart argues that it is "altogether opaque why law enforcement selected March 13, 2021, as the look-back date" and that this "constitutionally overboard" timeframe "shows that law enforcement sought the warrant simply as [an] impermissible fishing expedition rather than a search closely tied to the facts." (Dkt. 30 at 7-8.) The Government counters "[t]he time-period for the search was also reasonably limited to the date the firearm was purchased in March 2021 until the date of Hart's arrest in February 2023." (Dkt. 33 at 4.)

As the Government suggests, the affiant stated in the search warrant application that the firearm at issue in this case was lawfully purchased on March 13, 2021 "by an individual not named in this case." (Gov.'t Ex. 1 ¶ 21.) The firearm was then correlated to another "shots-fired incident" the next year in Minneapolis on February 15, 2022, one

18

year before the February 15, 2023 shots-fired incident at issue here involving Hart.  (*Id*.)
In *Milliman v. State of Minnesota*, a habeas petitioner argued that a "search warrant was
over broad because it covered a longer time span than that related to the investigated
offense" because "only records dated after June 1980 [the period of his wife's alleged
criminal activity] were relevant to the investigation for which the warrant was issued."
774 F.2d at 250.  The Eighth Circuit rejected this argument and held that a court should
"base its determination on such factors as the purpose for which the warrant was issued,
the nature of the items to which it is directed, and the total circumstances surrounding the
case."  *Id.*  In *United States v. Wendt*, the district court relied on *Milliman* when finding
the absence of "an express temporal limitation" did not render a warrant overbroad given
that the suspect "only began acquiring machine guns through his status as Adair Police
Chief in July 2018, and witnesses presumably only testified to the grand jury in 2022, it is
clear in context that the January 11 warrant limited the seizure of evidence to that
timeframe," and the items to be seized "nonetheless had to be tied to the five criminal
statutes identified" in the warrant.  No. 4:22-CR-00199 (SHL/HCA), 2023 WL 4248754,
at *17 (S.D. Iowa June 9, 2023).  Here, based on the allegations in the warrant, the
firearm was sold by an authorized dealer to a person other than Hart on March 13, 2021;
Hart acquired the Glock sometime between that date and the February 15, 2023 incident;
and the Glock was fitted with an auto sear sometime between March 13, 2021 and the
February 15, 2023 incident.  Based on these inferences, the "training and experience"
statements in the affidavit that individuals who unlawfully possess firearms often
communicate with others and take photos and video of the firearms using their cellular

phones, and the fact that the evidence sought related to violations of § 922(a), the Court finds the temporal limitation was not overbroad.

### 3. The Good-Faith Exception

Citing *United States v. Leon*, 468 U.S. 897 (1984), the Government counters that even if the search warrant lacked a substantial basis to justify probable cause for its issuance, "the good-faith exception to the warrant requirement would nonetheless properly preclude suppression in this case." (Dkt. 33 at 3-4.) Under *Leon*, "evidence seized pursuant to a search warrant issued by a magistrate [judge] that is later determined to be invalid[ ] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)). However, evidence obtained as a result of an unconstitutional search should be suppressed under the following circumstances:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;
>
> (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;
>
> (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and
>
> (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431).

Hart argues that *Leon* does not apply because the "bare bones" affidavit lacked indicia of probable cause when it "failed to supply any particularized basis that evidence of the charged crime will be found on any of the three cell phones or that probable cause supported a vast look-back period of March 13, 2021 to February 15, 2023." (Dkt. 30 at 8-9.) He does not argue, nor is there anything in the record to suggest, that the affidavit was deliberately or recklessly false, that the affidavit was not attached to the warrant, or that the issuing judge wholly abandoned his judicial role in issuing the warrant.

"The Eighth Circuit has found the *Leon* exception may apply to warrants that are insufficiently particular or overbroad." *Jackson*, 2019 WL 13127190, at *12 (citing *United States v. Henderson*, 416 F.3d 686, 695 (8th Cir. 2005) (affirming finding that good-faith exception applied to overly broad warrant); *United States v. Curry*, 911 F.2d 72, 77-78 (8th Cir. 1990) ("The *Leon* exception is not automatically inapplicable in every case where a warrant is found invalid on the ground that it is insufficiently particular.") (cleaned up)). Given the evidence connecting Hart to the February 15, 2023 incident and Glock fitted with an auto sear, the fact that the three phones were seized from him as a result of that incident, and the "training and experience" statements, the Court concludes that the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" and the warrant was not "so facially deficient" that no police officer could reasonably presume it was valid. As to the temporal scope, the affidavit contained some basis—the March 13, 2021 purchase and use of the Glock in a February 15, 2022 shooting incident—to understand where the timeframe came from and why the phones might contain evidence of how Hart acquired

the Glock, when it was fitted with the auto sear, and Hart's possession and use of the Glock, such that the affidavit and warrant satisfy *Leon*.  Accordingly, the Court alternatively recommends denial of the Motion based on the *Leon* exception.

***

For the reasons described, the Court recommends denial of Hart's Motion to Suppress the Evidence of an Unlawful Search (Dkt. 30).

## IV.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.  Defendant Moeshea Isiah Hart's Motion to Dismiss Indictment (Dkt. 31) be **DENIED**; and

2.  Defendant Moeshea Isiah Hart's Motion to Suppress Evidence of an Unlawful Search (Dkt. 30) be **DENIED**.

DATED: January 3, 2024                *s/Elizabeth Cowan Wright*
                                      ELIZABETH COWAN WRIGHT
                                      United States Magistrate Judge

<u>**NOTICE**</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).